3 P.3d 510

**STATE of Hawaiʻi, Plaintiff–Appellee,**

v.

**Benny B. PALISBO, Defendant–Appellant,**

and

**Peter M. Kanohokula, Defendant.**

No. 21441.

Intermediate Court of Appeals of Hawaiʻi.

May 18, 2000.

T. Stephen Leong, on the briefs, Honolulu, for defendant-appellant.

Caroline M. Mee, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE, and ACOBA, JJ.

## Opinion of the Court by ACOBA, J.

We hold that under Hawai'i Revised Statutes (HRS) § 708–836(3) (Supp.1998), which pertains to the unauthorized control of a propelled vehicle, criminal liability attaches if the defendant failed to obtain consent to operate the vehicle from the vehicle's owner. Thus, unlike the prior version of this statute, purported lack of knowledge that the vehicle was stolen does not absolve the defendant of a conviction and did not do so in this case. We also conclude that under the facts of this case, the circuit court of the first circuit (the court) properly refused the instructions of Defendant–Appellant Benny B. Palisbo (Defendant) on mistake of fact, "good faith belief," and conditional intent as excusing conduct otherwise culpable. Finally, we determine there were no prejudicial errors committed in this case.

Therefore, we affirm the court's March 11, 1998 judgment of guilty conviction and probation sentence rendered against Defendant.

### I.

### A.

On July 15, 1997, Defendant was charged in a two-count indictment. Only Count I,

alleging the unauthorized control of a propelled vehicle, in violation of HRS § 708–836 (1993 and Supp.1998), is at issue in this appeal.[1] Count I of the indictment stated:

On or about the 23rd day of August, 1996, in the City and County of Honolulu, State of Hawaii, PETER M. KANOHO-KULA [2] and [Defendant] did intentionally exert unauthorized control over a propelled vehicle, by operating the vehicle without the consent of James Keliipaakaua, owner of said vehicle, thereby committing the offense of Unauthorized Control of Propelled Vehicle, in violation of [§ ] 708–836 of the Hawaii Revised Statutes [ (HRS) ].

HRS § 708–836 provides as follows:

(1) A person commits the offense of unauthorized control of a propelled vehicle if the person intentionally exerts unauthorized control over another's propelled vehicle *by operating the vehicle without the owner's consent* or by changing the identity of the vehicle without the owner's consent.

(2) "Propelled vehicle" means an automobile, airplane, motorcycle, motorboat, or other motor-propelled vehicle.

(3) It is an affirmative defense to a prosecution under this section that the defendant:

(a) *Received authorization to use the vehicle from an agent of the owner* where the agent had actual or apparent authority to authorize such use; or

(b) Is a lien holder or legal owner of the propelled vehicle, or an authorized agent of the lien holder or legal owner, engaged in the lawful repossession of the propelled vehicle.

(4) For the purposes of this section, *"owner" means the registered owner* of the

---

1. On March 9, 1998, Plaintiff–Appellee State of Hawai'i (the State) moved to *nolle prosequi* Count II of the indictment, which had alleged that Defendant–Appellant Benny B. Palisbo (Defendant) had carried a deadly weapon, in violation of Hawai'i Revised Statutes (HRS) § 134–51(a). The circuit court of the first circuit (the court) ordered that a *nolle prosequi* be entered

without prejudice. Further, the judgment of conviction and sentence indicated that the "State will nolle prosequi Count II."

2. Peter M. Kanohokula (Kanohokula), who was convicted in this case, is not a party to this appeal.

propelled vehicle or the unrecorded owner of the vehicle pending transfer of ownership.

(5) Unauthorized control of a propelled vehicle is a class C felony.

(Emphases added.) Prior to Defendant's trial, co-defendant Peter M. Kanohokula (Kanohokula) pled no contest to the HRS § 708–836 offense of unauthorized control of the vehicle of James Keliipaakaua, Sr. (Keliipaakaua), as charged in the indictment. He was sentenced to five years' incarceration and given credit for time served. Kanohokula's guilty plea indicates that he did not make a "deal" with the government.

On December 1, 1997, the court addressed motions in limine. The pertinent motions in limine related to the application of amendments made to HRS § 708–836 in 1996 and revolved around the question of whether Defendant's purported lack of knowledge that the car was stolen absolved him of criminal liability. Defendant requested the following court order with respect to Kanohokula's expected testimony:

2. ... [A]n [o]rder permitting for use at trial the following evidence, which the [State] may attempt to exclude:

a. Testimony that [Kanohokula] was the actual car thief.

b. Testimony that [Kanohokula] told [Defendant] that he was borrowing the vehicle from [Kanohokula's] cousin.

c. Evidence that [Defendant] did not know the vehicle was stolen . . . .

Defense counsel argued that such testimony demonstrated Kanohokula was the "actual" car thief, and that Defendant was unaware of the vehicle's theft. Defense counsel asserted that the legislature did not intend to prevent a defendant from presenting such a defense.[3]

On the other hand, Plaintiff–Appellee State of Hawai'i (the State) moved for an order limiting Kanohokula's testimony as follows:

Specifically, the State most strenuously urges the [c]ourt to order the [d]efense not to elicit any testimony from [Kanohokula]—and that [Kanohokula], if permitted to testify, be instructed not to mention anything—as to the following matters:

1. Any statement about the van belonging to a cousin.

2. Any statement suggesting that [Kanohokula] had legitimate authority to drive or otherwise control the stolen van.

3. Any statement suggesting that [Kanohokula] had legitimate authority to permit [Defendant] to operate the van[.]

The deputy prosecuting attorney (the prosecutor) argued, "[T]he defense is going to try to defend on the grounds that he [ (Defendant) ] didn't know the car was stolen. And I'm going to try to argue that that's really not a part of my case to prove . . . ." The court granted Defendant's in limine motion and ruled that Kanohokula's testimony should not be limited, but also excluded any evidence that Defendant had actual consent

3. Specifically, defense counsel argued that
the legislature ... wanted to prevent people from claiming that they didn't know that [the vehicle] was stolen because experience[d] car thieves are aware of the loophole regarding that matter.

But in this case we have evidence that show that [D]efendant was indeed not aware. And this also goes with regard to telling the police that a person known only to them by first name and whose whereabouts are presently unknown gave them permission to use the vehicle.

In this case we're not giving an argument like that. *We're stating that [Kanohokula] told [Defendant] that this was his cousin's car and that [Kanohokula] would allow Defendant to drive it.*

The fact that [Kanohokula], the actual car thief, has been—had plead [sic] guilty to this

crime obviates the necessity of proceeding under a strict liability. If the legislature had intended this to be a strict liability offense they would have excised the terms intentionally or the term unauthorized control so that—in that part of the statute so that it would be the crime of the person exerts unauthorized control over another's propelled vehicle without the intent, or that a person intentionally exerts control over another's vehicle without knowing that it's unauthorized.

Since both of those were within the statute we believe that it's proper to argue this defense in this matter, although we would argue that the intent may or may not be there for other cases, but with this case it does seem appropriate[.]

(Emphasis added.)

to operate the vehicle from the owner or owner's agent. In construing the 1996 amendments, the court said:

> Well, I think Act 19[5 [4]] was passed to address the anomalous definition of owner, or it became anomalous after the UCPV [unauthorized control of a propelled vehicle] statute was tacked on to the chapter wherein owner is defined as one who has possession, even though possession is illegal leading to the anomalous situation in which a defense to lack of consent is that this guy who I know stole the car gave me permission to drive it, that's what 19[5] is for.
>
> [Act] 19[5,] I think even [the prosecutor] acknowledges[,] did not go so far as strict liability under one of the essential elements of the case namely the mental state to be applied to each and every essential element, that *he was aware that it was without the owner's consent.*
>
> *[Act] 19[5] also simply established an affirmative defense in the situation where the owner or an agent thereof gave permission.* Under those circumstances it appears that the circumstances are so either innocent or ambiguous as to warrant a preponderance of the evidence affirmative defense.
>
> I don't think the legislation either established strict liability or relieved the prosecution of the burden of proving beyond a reasonable doubt the mental state to be applied to each and every element of the offense. *So 2–A, B, C of [Defendant's] motion is granted.*
>
> *State's motion denied except insofar as there's going to be any testimony with respect to actual consent from the owner or the agent thereof. I don't think that's going to be the case in any event.*

(Emphases added.)

### B.

At trial, Defendant called Kanohokula to the stand. On direct examination, Kanoho-kula stated that when he arrived at Defendant's home with the vehicle, he told Defendant "[it] was my cousin's car."

Kanohokula indicated on cross-examination that Defendant appeared skeptical about the van belonging to Kanohokula's cousin.

[PROSECUTOR] Q. Did you tell [Defendant] that the van was stolen?

[KANOHOKULA] A. No.

. . . .

Q. When the [police] officer asked you about [Defendant]'s knowing the van was stolen you said that you had told him it was not, that it was your cousin's or a friend's or something like that, but then you said that [Defendant] didn't believe you, is that correct? [5]

A. Yeah.

. . . .

Q. Did [Defendant] say anything that would indicate that he thought you were lying about the van?

A. When he told me not?

Q. He told you not. And that was in response to your telling him that it was somebody else's van?

A. Yeah.

### C.

Defendant testified that Kanohokula arrived at his home on August 23, 1996, and indicated that the vehicle belonged to Kanohokula's cousin.

[DEFENSE COUNSEL]. Okay. What happened?

[DEFENDANT]. [Kanohokula] came upstairs and [my girlfriend] asked him if he could give us a ride to Schofield Sands, Wahiawa to see her friend. And then he said sure. And then we asked him how—how he came, he said his cousin's car or van.

---

**4.** Act 195 amended HRS § 708–836 by adopting a definition for the term "owner" and by amending the affirmative defense. 1996 Haw. Sess. L. Act 195 § 1 to § 5, at 447–48. The amended version of the statute is reproduced *supra* on page 3.

**5.** This reference in Kanohokula's testimony refers to a tape recorded interview with a Honolulu Police Department officer, which the parties had stipulated into evidence.

Q. Okay. And did you subsequently go in that van with your family to visit the baby?

A. Yes.

Q. And what happened when you—did [Kanohokula] say anything else about whose van it was or just the one time?

A. Yes, that one time.

. . . .

Q. Okay. Who was driving?

A. [Kanohokula].

Q. Okay. And he—did he have a key?

A. Yeah, he had a key.

According to Defendant, he and his family entered the van and Kanohokula drove them to "Schofield Sands." Later, Kanohokula asked Defendant to accompany him on a visit to Kanohokula's uncle in Haleiwa, and Defendant agreed.[6] When they arrived, the uncle asked both Defendant and Kanohokula to search for his missing dog. Kanohokula asked Defendant to drive the vehicle, apparently because Defendant "kn[e]w the area [and] where to go[.]" While Defendant was driving, a police officer began following the vehicle. Defendant related that the officer stopped the van and arrested them. He was confused and angry because he would not have driven or allowed his family to ride in a stolen vehicle:

> [DEFENSE COUNSEL] Q. ... Were you suspicious prior to that time that you saw the officer?
>
> [DEFENDANT] A. When [the officer] was following us, ... I asked [Kanohokula] about the van[. H]e said [it was] his cousin's[.] I said, okay.
>
> Q. So you weren't worried about the van?
>
> A. No.
>
> Q. Okay. After the other officer arrived what happened?
>
> A. That's when he told us for—to lay on the ground.
>
> Q. Okay. And did you do that?
>
> A. Yes.

Q. Okay. And did he tell you what you were being arrested for?

A. Yeah, for [the] stolen van. Stolen car.

Q. And how did you feel at that time?

A. That when I just looked at [Kanohokula] and I wen'—

Q. Were you pretty—

A. Confused and—

Q. How did you feel about [Kanohokula] at that time?

A. I was mad.

Q. Yeah, okay. If you knew that van was stolen would you have driven it?

A. No.

Q. If you knew that van was stolen would you have allowed [your girlfriend] and your son in the van?

A. No.

Q. And would you have entered that car if you knew it was stolen?

A. No.

On cross-examination, the State questioned Defendant about his use of the word "not" after Kanohokula told him that the van belonged to his cousin. Defendant indicated that he was "confused" by the question and asked the prosecutor to repeat it. The prosecutor asked again, "Yesterday you heard [Kanohokula] talk about how you had used the word not. And so my question to you is, could you tell us what that was about[?]" When Defendant's attorney objected to the question and the court overruled his objection, the prosecutor replied, "I think the witness has answered by his silence."

On redirect examination, Defendant reiterated that he believed Kanohokula's representation that the van belonged to Kanohokula's cousin.

### D.

Keliipaakaua testified that he owned a red Toyota van and was its registered owner. A photograph of the van and the registration papers were admitted into evidence without

---

**6.** The record is unclear as to who drove the van at this time; however, we surmise that Kanoho- kula did.

objection by Defendant. Keliipaakaua testified that on August 23, 1996, he "looked over to where [he had] parked [his] van and [he] did not see [it]." The police were called and Keliipaakaua reported his vehicle stolen. According to Keliipaakaua, he and his wife later saw his "van coming across on [a] side road and pull up right in front of [him]." Keliipaakaua related that he did not know the person driving the van. At trial he identified Defendant as the driver. Keliipaakaua said he saw another person, whom he could not identify, in the vehicle with Defendant. The prosecutor then questioned Keliipaakaua about whether he, or an agent of his, had given anyone permission to use the vehicle.

[PROSECUTOR]: Okay. Had you given anyone permission to drive your van that day?

[KELIIPAAKAUA]: No, sir.

Q. In particular had you given [Defendant] permission to drive that van?

A. No, sir.

Q. Do you have anybody that works for you or that's an agent of yours that—that you could authorize to give them permission to give somebody else permission to drive your van?

A. No, sir.

### E.

As part of closing instructions, the court instructed the jury on the offense of unauthorized control of a propelled vehicle as follows:

The Defendant, Benny B. Palisbo, is charged with the offense of Unauthorized Control of Propelled Vehicle.

A person commits the offense of Unauthorized Control of Propelled Vehicle if he intentionally exerts unauthorized control over another's propelled vehicle by operating the vehicle without the owner's consent.

There are three material elements of the offense of Unauthorized Control of Pro-

pelled Vehicle, each of which the prosecution must prove beyond a reasonable doubt.

These three elements are:

1. That on August 23, 1996, in the City and County of Honolulu, State of Hawaii, the Defendant, Benny B. Palisbo, exerted unauthorized control over another's propelled vehicle; and

2. That the Defendant did so by operating the vehicle without the owner's consent; and

3. That the Defendant did so intentionally.

"Propelled vehicle" means an automobile, airplane, motorcycle, motorboat, or other motor-propelled vehicle.

"Owner" means the registered owner of the propelled vehicle or the unrecorded owner of the vehicle pending transfer of ownership.

The court also instructed the jury on the requisite state of mind for conviction as follows:

A person acts intentionally with respect his conduct when it is his conscious object to engage in such conduct.

A person acts intentionally with respect to attendant circumstances when he is aware of the existence of such circumstances or believes or hopes that they cause such a result.

A person acts intentionally with respect to a result of his conduct when it is his conscious object to cause such a result.

The court did not give any instruction concerning the affirmative defense in HRS § 708–836(3).

Defendant's defense, as argued during Defendant's closing argument, was that Defendant "exhibited control over the vehicle . . . and although it was not authorized he did not intend to exert unauthorized control," thereby relieving him of criminal liability under HRS § 708–836.[7]

7. Defense counsel stated:

[T]he [c]ourt will give you an instruction that a person acts intentionally with respect to his conduct if his conscious object is to engage in such conduct. Was [Defendant]'s conscious

object to drive a stolen vehicle? I would submit to you that it was not.

A person acts intentionally with respect to attendant circumstances when he is aware of the existence of such circumstances or believes or hopes that they exist.

In closing and rebuttal argument, the prosecutor emphasized that it was not an element of HRS § 708–836 that Defendant knew, or did not know, that the vehicle was stolen, stating, "Nowhere are you going to hear in [the court's] instruction that it is a defense that [Defendant] didn't know [the vehicle] was stolen." The prosecutor urged that "all the State ha[d] to prove" were first, that "Defendant ... exerted unauthorized control over another's propelled vehicle" on August 23, 1996 in the City and County of Honolulu; second, that "Defendant did so by operating the vehicle without the owner's consent"; and third, that "Defendant did so intentionally."

## II.

Before addressing Defendant's points on appeal, we believe it helpful to review the legislative history of HRS § 708–836. When first enacted in 1972, the offense of unauthorized operation of a propelled vehicle was a misdemeanor and HRS § 708–836 stated as follows:

> (1) A person commits the offense of unauthorized operation of a propelled vehicle if he [or she] intentionally exerts unauthorized control over another's propelled vehicle by operating the same without the owner's consent.

> (2) "Propelled vehicle" means an automobile, airplane, motorcycle, motorboat, or other motor-propelled vehicle.

> (3) It is an affirmative defense to a prosecution under this section that the defendant reasonably believed that the owner would have authorized the use had he [or she] known of it.

1972 Haw. Sess. L. Act 9, at 101. "The affirmative defense allowed under subsection (3)[wa]s felt necessary to exempt from criminal liability a good deal of informal borrow-

ing of automobiles by members of the same household or friends of the owner." Commentary to HRS § 708–836 (1993) (internal quotation marks, citation, and footnote omitted).

In 1974, the words "unauthorized operation" were replaced by the phrase "unauthorized control" of a vehicle.[8] The penalty for the offense was increased to a class C felony. Supplemental Commentary to HRS § 708–836 (1993).

In 1996, the legislature again amended HRS § 708–836, defining the term "owner"[9] and altering the affirmative defense provision. 1996 Haw. Sess. L. Act 195, § 1, at 447. The purpose of the amendments was to close "a large, unintended loophole for defendants who are able to avoid conviction by alleging that a 'friend' loaned the car to him [or] her." Senate Stand. Comm. Rep. No. 1659, in 1996 Senate Journal, at 841. The legislature believed that "even if the police arrest someone driving a stolen vehicle, that person may escape conviction by stating that he or she received permission to use the vehicle from another person and that he or she was unaware that the vehicle had been stolen." 1996 Haw. Sess. L. Act 195, § 1, at 447. Therefore, it found "under the current law, prosecution [wa]s ineffective because of the loophole in the ... affirmative defense" and the interpretation of "owner." Senate Stand. Comm. Rep. No. 1659, in 1996 Senate Journal, at 841.

Prior to 1996, the term "owner" was not defined. The legislature, however, believed that " '[o]wner' ... [had been] defined by the law as a person having possession of the property involved, even if that possession is unlawful[,]" House Stand. Comm. Rep. No. 1236–96, in 1996 House Journal, at 1522, allowing a "loophole" in the law for those claiming to have permission to use the vehicle and to not know the vehicle was stolen.

---

Did [Defendant] hope to ride a stolen vehicle? ...

8.    (1) A person commits the offense of unauthorized control of a propelled vehicle if he [or she] intentionally exerts unauthorized control over another's propelled vehicle by operating the vehicle without the owner's consent or by changing the identity of the vehicle without the owner's consent.

1974 Haw. Sess. L. Act 38, at 68.

9. The legislative history indicates that the drafters believed they were "amending" the definition of "owner"; however, we note that "owner" had never been defined when the statute was first enacted in 1972, or when amended in 1974.

1996 Haw. Sess. L. Act 195, § 1, at 447. "Owner" was thus defined as "the registered owner of the propelled vehicle or the unrecorded owner of the vehicle pending transfer of ownership." 1996 Haw. Sess. L. Act 195, § 2, at 448.

The legislature also enacted a new affirmative defense provision which absolved a defendant of criminal liability only upon proof that the defendant "[r]eceived authorization to use the vehicle from an agent of the owner where the agent had actual or apparent authority to authorize such use[.]" *Id.* at 447–48; *see* HRS § 708–836 *supra* at 3. The agent affirmative defense was retained because

> it was not the intention of [the c]ommittee to make a felon out of a person who innocently accepts the word of an agent in lawful possession of a vehicle that the agent had the permission of the vehicle's owner to permit others to operate the vehicle, [therefore, the c]ommittee has included an affirmative defense to cover such a scenario.

House Stand. Comm. Rep. No. 1236–96, in 1996 *House Journal*, at 1522.

Hence, the effect of the most recent amendments to HRS § 708–836 is to place upon a non-owner driver of a vehicle the legal duty of obtaining consent to operate the vehicle directly from the registered owner [10]; the violation of such a duty will subject the non-owner to criminal liability unless he or she can prove by a preponderance of the evidence [11] that permission to use the vehicle

10. "Owner is also defined as "the unrecorded owner of the vehicle pending transfer of ownership." HRS § 708–836(4).

11. HRS § 701–115(2)(b) (1993) states in part that "[i]f the defense is an affirmative defense, the defendant is entitled to an acquittal if the trier of fact finds that the evidence ... proves by a preponderance of the evidence the specified fact or facts which negative penal liability."

12. Defendant challenges the prosecutor's representations throughout the trial that a person may be convicted of unauthorized control of propelled vehicle "while driving a vehicle he didn't know was stolen[,]" although he concedes this "is a correct statement of law." Defendant takes issue with the possibility that a juror, upon hearing these statements, may "believe that the lack of

was obtained from an agent who had actual or apparent authority to allow such use from the registered owner.

## III.

■ On appeal, Defendant first maintains that in ruling the State was not required to prove Defendant knew the van was stolen, the court "relieved the prosecution of it's [sic] duty to prove all elements of the offense beyond a reasonable doubt[.]"

However, on its face, HRS § 708–836 does not require proof that the accused knew the vehicle involved was stolen. By its plain language, the offense is committed when "the [accused] intentionally exerts unauthorized control ... *by operating the vehicle without the owner's consent* or by changing the identity of the vehicle without the owner's consent." (Emphasis added.) Thus, the statute requires only proof that the defendant's intentional conduct was to accomplish at least one of two objectives, that is, to operate the vehicle or to change the identity of the vehicle without having obtained the owner's consent in either event.[12]

## IV.

■ Second, Defendant argues that the court erred in failing to instruct the jury that the State was required to prove, as a state of mind element, that Defendant knew he was driving without the owner's consent.[13]

knowledge that the vehicle was stolen is not a defense." This issue was resolved *infra,* part IV, and therefore, need not be further discussed.

13. Specifically, Defendant maintains that "[t]he court indicated during motions in limine 'that the state of mind required the government to prove that Defendant knew that he was driving the vehicle without the owner's consent.'" However, Defendant does not reference where in the record or the motions in limine the court made this statement. This was a violation of Hawai'i Rules of Appellate Procedure Rule 28(b)(3), which provides in relevant part that an opening brief must contain "[a] concise statement of the case, containing the facts material to consideration of the questions and points presented, with record references supporting each statement of fact or mention of trial proceedings."

The culpable state of mind under HRS § 708–836(1), however, is not a knowing state of mind, but an intentional one. As shown above, the court's instructions explicitly defined "intentional" conduct. Read in conjunction with the elements instruction, the state of mind instruction was not " 'prejudicially insufficient, erroneous, inconsistent, or misleading.' " *State v. Kinnane*, 79 Hawai'i 46, 49, 897 P.2d 973, 976 (1995) (quoting *State v. Kelekolio*, 74 Haw. 479, 514–15, 849 P.2d 58, 74 (1993) (citations omitted)) (emphasis omitted).

### V.

Nothing in the history of HRS § 708–836 indicates that other defenses which may be available to a defendant under the penal code were foreclosed by the legislature.[14] Thus, Defendant was free to seek instructions based on defenses generally available under the penal code. As to such defenses, Defendant needed only to raise a reasonable doubt regarding his guilt unless a defense was designated as an affirmative defense.

### VI.

Defendant requested the following three instructions, all of which were refused by the court:

1. If you should find the accused acted in good faith and reasonably believed that his control over the vehicle was autho-

rized, or with the consent of a lawful owner-operator, you must vote for acquittal of the accused. [ (Instruction 1) ]

2. If you should find the accused's intent was conditional and the condition negatives the harm or evil sought to be prevented by the law prohibiting the defense, you must vote for acquittal. HRS § 702–209. [ (Instruction 2)[15]]

4. If you should find that the accused engaged in the prohibited conduct under ignorance or mistake of fact and that mistake negates the state of mind required to establish an element of the offense, you must vote for acquittal of the accused. [ (Instruction 4) ]

We agree that a criminal defendant is "entitled to an instruction on every defense or theory of defense having any support in the evidence, provided such evidence would support the consideration of that issue by the jury, no matter how weak, inconclusive or unsatisfactory the evidence may be." *State v. Robinson*, 82 Hawai'i 304, 313–14, 922 P.2d 358, 368–69 (1996) (internal quotation marks and citations omitted), *overturned on other grounds, State v. Tafoya*, 91 Hawai'i 261, 982 P.2d 890 (1999). However, we conclude the court was correct in refusing to give these instructions.

---

**14.** The distinction between an affirmative defense and a non-affirmative defense is set forth in HRS § 701–115:

(1) A defense is a fact or set of facts which negatives penal liability.

(2) No defense may be considered by the trier of fact unless evidence of the specified fact or facts has been presented. If such evidence is presented, then:

(a) If the defense is not an affirmative defense, the defendant is entitled to an acquittal if the trier of fact finds that the evidence, when considered in the light of any contrary prosecution evidence, raises a reasonable doubt as to the defendant's guilt; or

(b) *If the defense is an affirmative defense, the defendant is entitled to an acquittal if the trier of fact finds that the evidence,* when considered in light of any contrary prosecution evidence, *proves by a preponderance of the evidence the specified fact or facts which negative penal liability.*

(3) *A defense is an affirmative defense if:*

(a) *It is specifically so designated by the Code or another statute;* or

(b) If the Code or another statute plainly requires the defendant to prove the defense by a preponderance of the evidence.

(Emphases added.) The commentary to HRS § 701–115 states that "[s]ubsection [ (3) ] defines 'affirmative defense,' making it clear that this type of defense requires special legislative prescription. Unless the legislature has made a particular defense affirmative, the defendant's burden is only to raise a reasonable doubt." *See State v. Gabrillo*, 10 Haw.App. 448, 456, 877 P.2d 891, 895 (1994) (stating that "where the criminal defense is not an affirmative defense, the 'defendant need only raise a reasonable doubt as to his guilt' ") (quoting Commentary to HRS § 701–115 (1985)).

**15.** Defendant's Instruction 3 involved a mistake of law defense. At a proceeding held at the close of Defendant's case, Defendant indicated that the instruction was withdrawn.

## A.

■ The defense of mistake of fact under HRS § 702–218(1) (1993) [16] is premised on the proposition that a factual mistake on the defendant's part negates the required state of mind under the statute and thus relieves the defendant of criminal liability.[17] *See State v. Cavness*, 80 Hawai'i 460, 465, 911 P.2d 95, 100 (App.1996) (holding that a "viable mistake of fact defense" to a criminal trespass offense requiring an intentional, knowing or reckless state of mind is established if the defendant negligently believed that he [or she] had a right to be on the premises.) [18]

■ Here, the only factual mistake which would have absolved Defendant from liability under the statute would be a mistaken belief that the owner himself had authorized Defendant's use of the vehicle. Defendant did not adduce evidence suggesting that he had obtained the consent of Keliipaakaua, the van's *owner*, to operate it. If Defendant had presented evidence tending to show that he was under the mistaken belief that the owner had authorized him to operate the vehicle, then the jury would have had to be instructed on the mistake of fact defense.

However, Defendant's defense had nothing to do with believing that he himself had the owner's consent. Indeed, on appeal, Defendant maintains that the mistake of fact instruction should have been given since "he believed that *Kanohokula's* use of the vehicle was lawful." (Emphasis added.) Therefore,

Defendant here sought to avoid conviction "by stating that he ... received permission to use the vehicle from another person and that he ... was unaware that the vehicle had been stolen," *see* 1996 Haw. Sess. L. Act 195, § 1, at 447, a contention which was the very "loophole" the legislature sought to foreclose in amending HRS § 708–836(3).

## B.

■ Defendant did not request an instruction on the agent affirmative defense available under HRS § 708–836. We believe there was no rational basis for giving such an instruction. *See State v. Timoteo*, 87 Hawai'i 108, 117, 952 P.2d 865, 874 (1997) (stating that "under HRS § 701–109(5) (1985), a trial court is not obligated to charge the jury with respect to an included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting him of the included offense") (internal quotation marks and citation omitted); *see also Kinnane*, 79 Hawai'i at 50, 897 P.2d at 977 (stating that "[w]here there is such a rational basis in the evidence ... [the supreme court has] held that it may be plain error for a trial court to fail to give an included offense instruction even when neither the prosecution nor the defen[se] ha[s] requested it") (emphasis and footnotes omitted). Defendant did not adduce any evidence that Kanohokula was the agent of Keliipaakaua, the van's owner. Indeed, the evidence at trial was indisputably to the contrary.

16. HRS § 702–218 (1993) provides, in part:

**Ignorance or mistake as a defense.** In any prosecution for an offense, it is a defense that the accused engaged in the prohibited conduct under ignorance or mistake of fact if:

(1) The ignorance or mistake negatives the state of mind required to establish an element of the offense[.]

17. The commentary on HRS § 702–218 reads, in pertinent part:

This section states the logical concomitant of the requirement that to establish each element of an offense a certain state of mind with respect thereto must be proven. *Thus, if a person is ignorant or mistaken as to a matter of fact or law, the person's ignorance or mistake will, in appropriate circumstances, prevent the person from having the requisite culpability with respect to the fact or law as it actually*

*exists. ... A reckless mistake would afford a defense to a charge requiring intent or knowledge*—but not to an offense which required only recklessness or negligence....

... The Code correlates the culpability required for commission of the offense with the culpability which will deprive ignorance or mistake of effect as a defense.

(Emphases added.)

18. In *State v. Cavness*, 80 Hawai'i 460, 463, 911 P.2d 95, 98 (App.1996), the defendant was charged under HRS § 708–814(1)(b) (1985), with criminal trespass that required he have entered or remained on property "intentionally, knowingly, or recklessly[.]" The trial court refused to allow the defendant to testify to his belief that "he had a right to be on the premises[,]" because "it [wa]s not within reason" that he had this belief. *Id.*

## C.

█ Defendant cites no statutory or common law authority to support a "good faith belief" defense to criminal liability. The good faith belief, according to Defendant, consisted of his belief that Kanohokula's use was authorized. But this "defense" poses essentially the same justification for avoidance of liability as did Defendant's version of the mistake of fact defense, that is, that Defendant believed Kanohokula was authorized to use the vehicle and, thus, his own use was permissive. For the same reasons we must reject Defendant's mistake of fact defense, we conclude that the court did not err in refusing to give the instruction on Defendant's good faith belief.

## D.

█ Defendant sought an instruction on conditional intent pursuant to HRS § 702–209 (1993).[19] The commentary to HRS § 702–209 provides the following example of how this provision may be applied:

A person accused of burglary would not be excused because the person intended to steal only if no one else was in the building, whereas a person charged with attempted rape, predicated on a preliminary assault, would be excused of that offense if the person intended to effect sexual intercourse only if the mature victim consented. . . .

It does not appear that Defendant's "conditional intent" argument is of the type envisioned by HRS § 702–209. Defendant maintains that his intent to use the vehicle was "conditioned" upon his belief that Kanohokula was authorized to use the vehicle and could authorize Defendant's use of the vehicle. In the example of attempted rape, the "harm or evil sought to be prevented" would be the nonconsensual and violative nature of sexual intercourse; thus, a person who intended only consensual intercourse would be guilty of a lesser crime.

We see no parallel in Defendant's argument of "conditional intent." Defendant's belief that he was authorized to use the vehicle does not negate the "harm or evil sought to be prevented" of operating a vehicle without the owner's consent. Again, Defendant's argument that his use was authorized by Kanohokula is the very loophole closed by the 1996 amendment to HRS § 708–836. *See* 1996 Haw. Sess. L. Act 195, § 1, at 447. Thus, we conclude that the court did not err in refusing to give this instruction.

## VII.

We examine other errors raised by Defendant.

## A.

█ Defendant maintains that the court abused its discretion in dismissing Clifford Maning (Maning) for cause. During voir dire, Maning informed the court that he did not know Defendant, but was related to the Palisbo family. Upon questioning by defense counsel, Maning stated that he could be open-minded, but expressed concern about "meeting the [Palisbo] family afterwards." The prosecutor requested Maning be struck for cause, but defense counsel objected, arguing, *inter alia*, that "in Hawai'i, everyone is related[.]" The court granted the State's challenge, stating, "I'd hate to have [Maning] find out exactly what the relation [to Defendant] is during trial whether it be through his own illegitimate efforts or relatives coming to call him[.]"

█ We have indicated "that the decision to remove a [venireperson] for cause must be left to the sound discretion of the trial judge who is in a better position than the appellate court to ascertain from the answers of the juror whether the juror is able to be fair and impartial." *State v. Cardus*, 86 Hawai'i 426, 438, 949 P.2d 1047, 1059 (App.1997) (internal quotation marks and citations omitted). HRS § 612–7 (1993) provides that "[a] juror

19.  HRS § 702–209 (1993) provides, in part:
**Conditional Intent.** When a particular intent is necessary to establish an element of an offense, it is immaterial that such intent was conditional unless the condition negatives the harm or evil sought to be prevented by the law prohibiting the offense.

shall not be excused by a court for slight or trivial cause[.]" The court recognized, as we do, that the blood relationship between Maning's and Defendant's families was not "slight or trivial cause" for excusal. Under the circumstances, we conclude it was within the court's discretion to excuse Maning for cause.

### B.

▇▇ Defendant contends the prosecutor's exclusion of potential jurors with Filipino surnames was racially motivated and challenged the exclusions, asserting that "there's been at least some showing that [F]ilipinos have been excluded from this jury based upon the exclusion of [Enrico Pablo (Pablo)] and [Orlando Layugan (Layugan)]."

▇▇ The Hawai'i Supreme Court has prohibited the exercise of peremptory challenges "to exclude entirely from the jury all persons who are of the same ethnic[ ] minority as the defendant, ... and the prosecutor must, to the satisfaction of the court, explain his or her challenges on a non-ethnic[ ] basis." *State v. Batson,* 71 Haw. 300, 302–03, 788 P.2d 841, 842 (1990), *reconsideration denied,* 73 Haw. 625, 834 P.2d 1315 (1992). While the court agreed that there appeared to be a

"suspect classification" involved, it rejected Defendant's challenge on the basis that the prosecutor's reasons "appear[ed] to be non-discriminatory, non-suspect and amply born[e] out by the record[.]" [20]

We cannot conclude that on the record the prosecutor failed to present race-neutral explanations for excusing Pablo and Layugan. However, we caution that the trial courts must be especially vigilant in ferreting out the actual motives of counsel and any hint of racially-based exercise of peremptory challenges should not be tolerated. *See State v. Rogan,* 91 Hawai'i 405, 415, 984 P.2d 1231, 1241 (1999) (stating that "appeals to racial prejudice lack the professionalism and decorum required of attorneys who practice before the bar of the courts of Hawai'i and will not be tolerated").

### C.

Defendant asserts that the prosecutor questioned his girlfriend (girlfriend) regarding irrelevant matters including "marital status, whether Defendant and girlfriend lived with their parents,[21] whether she and Defendant currently own or had ever owned a car, girlfriend's car being towed,[22] and driving

---

**20.** Specifically, the prosecutor responded to Defendant's challenge under *State v. Batson,* 71 Haw. 300, 788 P.2d 841 (1990), as follows:

As for my reasoning[, Enrico Pablo] had talked about how he, because of his religious faith, felt hesitant to convict anybody or sit in judgment of anybody. And that almost convinced me.... But then later on when [defense counsel] asked him about the most important decision in his life[,] he said his acceptance of Jesus Christ as his savior six months ago....

And I thought to myself, not only does he have this religious feeling about convicting people, but ... it's only six months old.... [I]t may just be dangerous to keep him.

The other one was [Orlando Layugan (Layugan)]. And of all the ones—the jurors that said they felt the State should prove knowledge that [the car] was stolen. He seemed to stick to his guns....

And I just felt that since that was such a critical element in the case I better get rid of [Layugan], but it certainly had nothing to do with race.

We note that the prosecutor used his first peremptory challenge against venireperson Solomon Perry (Perry), who had indicated during voir dire that it was unfair that a person could be charged with unauthorized control of a propelled vehicle

when the person did not know the vehicle was stolen. Because Defendant did not raise a *Batson* challenge against Perry, no reason was necessary for excusing Perry; however, we further note that Perry's views were similar to statements made by Layugan, the subject of the prosecutor's second peremptory challenge.

**21.** During trial, the prosecutor asked Defendant's girlfriend about her and Defendant's living arrangement as follows:

Q. Are you and [Defendant] married?
A. No, common law.
Q. Okay. Do you live together in the same house?
A. Yes.
Q. Okay. When—does anyone else live in that house? I mean, does—
A. No.
Q. Does—[Defendant] doesn't live with his family, his parents?
A. No, he live[s] with me.
Q. Oh, okay.
A. Why would he live with his parents ... ?
Q. Just asking....

**22.** At trial, the testimony of Defendant's girlfriend (girlfriend) consisted, in part, as follows:
[PROSECUTOR] Q. Okay. How long—how long prior to your—August had your car been towed away?

without a license." The State maintains that the questions on marital status were asked to clarify her testimony on direct examination and to show her bias in favor of Defendant,[23] questions regarding her parents were asked to determine the extent of her financial dependence on Defendant, questions regarding the availability of a vehicle showed "that Defendant, without a car, might have a motive to use another person's car without permission[,]" and questions regarding driving without a license were intended to contradict Defendant's assertion that "he was so law abiding that he [would] never knowing[ly] ... have driven a stolen car." Defendant fails to state how these questions prejudiced him, or how they affected his substantial rights.

■■■■ Evidentiary rules based on relevance objections are reviewed under the right/wrong standard. *State v. Kupihea*, 80 Hawai'i 307, 314, 909 P.2d 1122, 1129 (1996) (citation omitted). The relevance inquiry is whether "the fact for which the evidence is proffered [is] 'of consequence to the determination of the action'; and ... [whether] the proffered evidence tend to alter the probability of that fact." *Id.* at 315, 909 P.2d at 1130 (quoting HRE Rule 401).

■■■■ The prosecutor's questions regarding marital status were relevant to clari-

fy girlfriend's testimony on direct examination that Defendant was her "old man." Questions regarding Defendant's living arrangements were relevant to clarify that Defendant lived with her and, thus, her potential bias in favor of him. The questions regarding availability of a vehicle and the need for a ride were "of consequence to the determination" of whether Defendant had a reason to exert unauthorized control of the van because, as the State argues, this fact would reveal a motive for Defendant's using another person's car without permission. Evidence that girlfriend's car had been towed and that she did not have a car would illustrate Defendant's lack of access to and his need for a vehicle, and would "alter the probability" that Defendant would use another person's car without permission. Thus, the evidence was relevant, and absent any argument by Defendant that it was prejudicial, we hold that the court was not wrong in overruling Defendant's objections.

### D.

■■■■ Defendant contends that it was improper for the prosecutor to have asked Kanohokula about his probationary status at the time of the offense because there was no "factual" or good-faith basis for such questioning.[24] He objects to the prosecutor's

---

23. On direct examination, girlfriend testified as follows:

> [DEFENSE COUNSEL] Q. Could you tell the jury how you know [Defendant]?
> A. That's my old man. I was going with him for 12 years and we have two kids, one boy, one girl. And what else? That's all....

The State asserts that it was clarifying what girlfriend meant by "old man" when it asked about the relationship between Defendant and girlfriend.

[The following occurred during cross-examination:]

> [GIRLFRIEND] A. The thing got towed away two months before August, I never have my car already.
> Q. Did [Defendant] drive that car[?]
> [DEFENSE COUNSEL]: Objection, relevance.
> [GIRLFRIEND]: What? I no understand.
> [DEFENSE COUNSEL]: Objection is relevancy.
> [PROSECUTOR]: We're talking about availability of automobiles and cars and who needs rides.
> THE COURT: Overruled.
> [DEFENSE COUNSEL]: Okay.

24. The following occurred on cross-examination:

> [PROSECUTOR]. Okay. Did [Defendant] notice that you were on probation?
> [KANOHOKULA]. I wasn't on probation—
> [DEFENSE COUNSEL]. Objection, vague as to time period.
> THE COURT: Sustained.
> [PROSECUTOR]. In the week let us say[,] before this incident took place[,] did you talk about your probation?
> [DEFENSE COUNSEL]. Objection.
> [DEFENDANT]. I wasn't on probation.
> THE COURT. I'm sorry
> [DEFENSE COUNSEL]. Lack of foundation.
> THE COURT. Sustained.
> [PROSECUTOR]. Okay.
> THE COURT. Assumes facts not in evidence.
> [DEFENSE COUNSEL]. Yeah.
> [PROSECUTOR]. Okay.
> Prior to—in the six months or so prior to this incident in August were you on probation?
> [KANOHOKULA]. Probation.
> Q. Yes, probation.

questions because they "can leave in the minds of the jurors damaging and prejudicial but false and inadmissible ideas that cannot be rebutted by testimony of witnesses or instructions from the court." The State maintains that these questions were proper because Defendant had depended on Kanohokula's representation that he had borrowed the vehicle, and "[t]he jury could infer that Defendant's knowledge that Kanohokula was *ever* on probation ... would have given Defendant reason not to believe Kanohokula's claim that the van belonged to a cousin." (Emphasis added.)

■ Kanohokula responded that he was not on probation until 1997, after the offense. We agree that such questioning was totally irrelevant and if without any factual basis, patently improper. The court was obligated to preclude any questions at all in this area. While we believe the matter was improper, we believe Defendant did not suffer any prejudice since Kanohokula answered he was not on probation during the relevant time and was not contradicted.

### E.

### 1.

■ Defendant contests the prosecution's inquiry about Defendant's purported response of "not" to the claim that the vehicle belonged to Kanohokula's cousin.[25] The State does not directly respond to this argument. However, it appears to us that the prosecutor's questions sought a response regarding Kanohokula's statement to the police and, thus, these questions were proper cross-examination, in terms of clarifying Kanohokula's statement.

### 2.

■ Defendant disputes the prosecutor's assertion in closing argument that Defendant's purported use of the word "not" indicated Defendant knew the van was stolen.[26] However, "a prosecutor, during closing argument, is permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence. *State v. Clark*, 83 Hawai'i 289, 304, 926 P.2d 194, 209, *reconsideration denied*, 83 Hawai'i 545, 928 P.2d 39 (1996) (citing *State v. Apilando*, 79 Hawai'i 128, 141, 900 P.2d 135, 148 (1995) (citation omitted)). We believe it could be reasonably inferred from Defendant's response that he believed the van was stolen.

### 3.

■ Defendant argues that the court erred in denying his motion for mistrial following the prosecutor's questioning about Defendant's alleged use of the word "not."

[PROSECUTOR] Q. Okay. Let me try something else then. [Kanohokula] said that you said not, do you remember that?

[DEFENDANT] A. Um, a little bit.

Q. Could you tell us what that's about?

[DEFENSE COUNSEL]: *I would object, I believe the question is vague and confusing.*

THE COURT: Overruled.

. . . .

A. When he told me not?

Q. He told you not. And that was in response to your telling him it was somebody else's van?

A. Yeah.

---

A. No, I wasn't on probation until [1997].

25. The prosecutor questioned Kanohokula regarding Defendant's response to Kanohokula's representation that he had borrowed the vehicle as follows:

[PROSECUTOR] Q: When the officer asked you about [Defendant] knowing the van was stolen you said that you told [Defendant] it was not, that it was your cousin's or a friend's or something like that, but then you said that [Defendant] didn't believe you, is that correct?

[KANOHOKULA] A: Yeah

. . . .

Q. Did [Defendant] say anything that might would indicate that he thought you were lying about the van?

26. The prosecutor referred to Kanohokula's "sociopathic attitude[,]" and stated that for "[Kanohokula] to come driving up in a shiny new Toyota van under those circumstances, it's not surprising that when he said it was his cousin's, [Defendant] replied 'not.' [Defendant] knew that van was stolen." Defense counsel objected, arguing the statement misstated the evidence, but the court overruled the objection.

[DEFENSE COUNSEL]: *Counsel is assuming that [Defendant] actually said not as opposed to [Kanohokula] said that [Defendant] said not.*

THE COURT: Overruled.

(Emphases added.)

Defense counsel moved for mistrial because of the foregoing questions:

[DEFENSE COUNSEL]. As I stated in chambers, I was going to move for a mistrial based upon prosecutorial misconduct. And that misconduct being—regarding the cross-examination of [Defendant] when he was on the stand.

. . . .

And that was based upon the facts that — based upon [Kanohokula's] testimony that my client said "not." [The prosecutor] assumed that my client said not when my client never said not and stated that he didn't say not on the witness stand.

. . . .

I believe there was a mistake by [the prosecutor] in that [the prosecutor] did not say—ask [Defendant] whether or not he said not. And I think that should have been done prior to that question being asked. Since that was not done, it put my client in a very bad position and in a very bad light in front of this jury.

. . . .

And we would ask for a mistrial or in the alternative a curative instruction stating that they should disregard the prosecution's cross-examination and strike the prosecutor's cross of my client from the record.

And we would also ask that the prosecution not be allowed to make any arguments regarding the credibility of [Defendant] based upon his demeanor on cross-examination during his closing argument.

■■■ Generally, the trial court determines when a mistrial is warranted, *State v. Nupeiset,* 90 Hawai'i 175, 179, 977 P.2d 183, 187 (App.1999), and the denial of a motion for mistrial is reviewed under an abuse of discretion standard. *State v. Loa,* 83 Hawai'i 335, 349, 926 P.2d 1258, 1272 (1996) (citations

omitted). " 'An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or disregarded the rules or principles of law or practice to the substantial detriment of a party litigant.' " *Id.* (quoting *State v. Jackson,* 81 Hawai'i 39, 47, 912 P.2d 71, 79 (1996) (citations and internal quotation marks omitted)).

■■■ We do not believe the court abused its discretion in denying defendant's motion. Cross-examination includes " 'full development of matters broached on direct examination, including facts reasonably related to matters touched on direct[.]' " *Id.* (quoting A. Bowman, *Hawaii Rules of Evidence Manual* § 611–2B (1990)). In this regard, the extent of cross-examination "rests within the sound discretion of the trial court." *State v. White,* 92 Hawai'i 192, 205, 990 P.2d 90, 103 (1999) (citing *State v. Kauhi,* 86 Hawai'i 195, 197, 948 P.2d 1036, 1038 (1997)).

In the instant case, Defendant was asked on direct examination about Kanohokula's report that the van belonged to his cousin. Cross-examination regarding Defendant's reaction to Kanohokula's representation was "reasonably related" to Defendant's testimony on direct examination. Because the prosecutor's questions were within the allowable scope of cross-examination, we conclude that the court did not abuse its discretion.

### F.

■■ Defendant maintains that the prosecutor committed misconduct in injecting personal opinions and comments on evidence during his rebuttal argument, including statements that as a prosecutor "you never . . . have to go forward with a case that you do not personally believe in" and that "[w]e do not prosecute innocent people." While we agree that such statements were obviously improper, these comments were stricken from the record by the court. Accordingly, we conclude Defendant was not prejudiced by them. Defendant argues that court erred in failing to instruct the jury on the effect of

such stricken matters.[27] On appeal, he maintains that after striking these statements, the court should have given an "immediate cautionary instruction," which he does not define, or Instruction 3.04 from the *Hawai'i Standard Jury Instructions Criminal* (HAWJIC) (December 1991).[28] Absent any curative instruction, he speculates that the jury may have improperly relied on the prosecutor's statements. Defendant did not make these specific objections during the trial.

 While we believe it highly advisable that HAWJIC instruction 3.04 be given at some point, preferably at the beginning of trial and/or at the conclusion of trial, it does not appear from the record as a whole that the court's omission of such an instruction was prejudicial. Defendant points to no specific prejudice engendered by this failing. The statements were stricken in the presence of the jury. Hence, we believe the court adequately conveyed to the jury its determination that the prosecutor's comments were improper and were thus to be disregarded.

## VIII.

Accordingly, we affirm the court's March 11, 1998 judgment of guilty conviction and probation sentence.

---

27. The prosecutor's statements, and the court's responses, were as follows: ·

    [PROSECUTOR]: If I understood defense's [closing] argument correctly, he seems to suggest that we had points in systems and statistics and that we got certain points for convicting innocent people. That is preposterous …

    ….

    *One of the really great things about being a prosecutor is that you never, never have to go forward with a case that you do not personally believe in.*

    [DEFENSE COUNSEL]: *Objection, Your Honor. Calls for personal belief o[ff] counsel's opinion.*

    THE COURT: *Sustained.*
    [DEFENSE COUNSEL]: *Move to strike.*
    THE COURT: *Stricken.*
    [PROSECUTOR]: We do not prosecute innocent people.
    [DEFENSE COUNSEL]: *Objection, same objection, Your Honor.*
    THE COURT: *Sustained.*
    [DEFENSE COUNSEL]: *Move to strike.*
    THE COURT: *Stricken.*
    (Emphases added.)

28. *Hawai'i Standard Jury Instructions Criminal* (HAWJIC) (December 1991) Instruction 3.04 states, "You must disregard entirely any matter which the court has ordered stricken."